**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**RIAD M. SLEIT,**

        **Plaintiff,**

**v.**                                               **Case No. 8:07-cv-724-T-23TBM**

**RICOH CORPORATION,**

        **Defendant.**

_____/

## REPORT AND RECOMMENDATION

THIS MATTER is before the court on referral by the Honorable Steven D. Merryday for a Report and Recommendation on **Defendant's Motion for Judgment on the Pleadings as to Counts I, II and III** (Doc. 66) and Plaintiff's response in opposition (Doc. 88), and **Defendant's Motion for Summary Judgment** (Doc. 67) and Plaintiff's preliminary response in opposition (Doc. 72).[1]  The court heard oral arguments on the motions on August 15, 2008.

I.

The undisputed facts establish that Plaintiff, Riad M. Sleit ("Plaintiff" or "Sleit"), is an Arab-American of Lebanese descent born in Beirut, Lebanon, and a resident of Florida.[2]

---

[1]Defendant's motions incorporate a number of exhibits in support.  Plaintiff's pleadings are supplemented with numerous affidavits.  *See* (Docs. 75-82, 89, 106). Subsequent to the hearing, the court directed Plaintiff to submit a condensed version of his deposition, which was filed along with exhibits.  *See* (Docs. 108-110).

[2]The term "Arab-American of Lebanese descent" is how Plaintiff describes his ethnicity.

Between 1989 and 1997, Plaintiff owned and operated American Office Technology, an independent office equipment dealer handling Ricoh Corporation's ("Ricoh" or "Defendant") manufactured products under the Savin name.  In 1997, Plaintiff's dealership was acquired by Savin Corporation and Plaintiff assumed the position of branch general manager in the Tampa, Florida, region.[3]  Plaintiff remained in that position for ten years.  He operated under an oral employment agreement and was paid a salary and bonuses annually.

In April 2007, Ricoh merged with a subsidiary, Lanier Worldwide, Inc. ("Lanier"). The merger brought a reorganization to Defendant's operations.  Under the reorganization, the branch general manager position in Tampa and elsewhere was replaced by a marketplace general manager position and Plaintiff was required to apply for the position.  As discussed below, in the lead-up to the merger, Plaintiff expressed an interest in that position and was scheduled for an interview on two occasions.  As it developed, Craig Current, a Lanier employee, was named the new marketplace general manager in Tampa without Plaintiff being afforded an opportunity to interview for the position.  Plaintiff also pursued another opportunity as vice president of sales in the Pacific North region but was not interviewed for that position either, ostensibly because the decision was made not to fill the position. Although there were other job opportunities in the reorganized company, Plaintiff was not hired for any of them.  Plaintiff's job ended as of the merger date, April 1, 2007.

---

[3]It appears that Savin was merged into Ricoh in about 2003 or 2004.

2

By his Verified Third Amended Complaint ("Complaint"), Plaintiff alleges claims for breach of an express oral employment contract (Counts I and II),[4] breach of an implied contract (Count III),[5] unjust enrichment (Count IV), and discrimination on the basis of national origin in connection with certain hiring decisions (Count V). *See* Compl. (Doc. 42). In essence, Plaintiff alleges an employment contract comprised of loosely organized verbal promises that Defendant breached thereby interfering improperly with Plaintiff's accounts, revenues and compensation. To the extent that Plaintiff has no remedy for breach of contract, Plaintiff sues for unjust enrichment. Additionally, Plaintiff brings a claim for national origin discrimination for the Defendant's failure to hire him for any position in the merged company because he is Arab-American.

Defendant argues generally that the alleged oral contract is too indefinite to permit enforcement under Florida law and the statute of frauds bars Plaintiff's enforcement of the same. It urges the court has already determined that the breach of implied contract alleged in Count III is also barred as a matter of law since it is based on alleged breaches of the implied provisions of the company's Code of Conduct and Code of Ethics. In its motion for summary

---

[4]The particulars of the alleged express oral agreement are set forth in paragraph six of the Complaint. Count II differs from Count I in that it incorporates into the employment contract the "expressly agreed terms and conditions of employment" set out in the Defendant's Code of Conduct and Orderly Marketing Guidelines ("Code of Conduct") and Code of Ethics, whereas Count I omits such terms. Plaintiff's contract claims allege breaches by Ricoh since 2003. Plaintiff seeks past and future damages.

[5]Here, Plaintiff's allegations "omit" the express oral terms relied upon in Counts I and II, including any express terms in the Code of Conduct and Code of Ethics. However, the allegations incorporate the implied terms and conditions of employment including those in the Code of Conduct whereby Ricoh impliedly agreed and tacitly promised to pay Plaintiff according to the implied terms of employment set out in paragraphs six and seven.

judgment, Defendant argues further that the claim for unjust enrichment in Count IV is barred because the undisputed facts establish that Plaintiff was fully and fairly compensated for the work he performed.  As for the claim of discrimination in Count V, Defendant urges that Plaintiff cannot establish even a *prima facie* case of national origin discrimination and, even if he could, he cannot show pretext in the legitimate reasons proffered by the Defendant for its hiring decisions.

II.

A.

The court shall grant summary judgment for the moving party only when "there is no genuine issue as to any material fact and . . . the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The court may look to "the pleadings, the discovery and disclosure materials on file, and any affidavits" in determining whether summary judgment is appropriate.  Fed. R. Civ. P. 56(c).  The movant bears the exacting burden of demonstrating that there is no dispute as to any material fact in the case.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 918 (11th Cir. 1993).

Once the moving party satisfies its burden, the burden shifts to the non-moving party to establish the existence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 324; *Howard v. BP Oil Co.,* 32 F.3d 520, 524 (11th Cir. 1994).  The non-movant must designate specific facts showing a genuine issue for trial beyond mere allegations or the party's perception.  *Perkins v. Sch. Bd. of Pinellas County*, 902 F. Supp. 1503, 1505 (M.D. Fla.

4

1995).  It must set forth, by affidavit or other appropriate means, specific facts showing that there is a genuine issue for trial.  *See* Fed. R. Civ. P. 56(e)(2).

When deciding a motion for summary judgment, "[i]t is not part of the court's function . . . to decide issues of material fact, but rather determine whether such issues exist to be tried . . ." and "[t]he court must avoid weighing conflicting evidence or making credibility determinations."  *Hairston*, 9 F.3d at 919 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986)).  The only determination for the court in a summary judgment proceeding is whether there exists genuine and material issues of fact to be tried.  *Hairston*, 9 F.3d at 921; *see also Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 959 (11th Cir. 1997).  All the evidence and inferences from the underlying facts must be viewed in the light most favorable to the nonmoving party.  *Combs v. Plantation Patterns*, 106 F.3d 1519, 1526 (11th Cir. 1997).

B.

As a general principle, "an employment contract requires definiteness and certainty in its terms."  *Quaker Oats Co. v. Jewell,* 818 So. 2d 574, 578 (Fla. Dist. Ct. App. 2002) (quoting *Muller v. Stromberg Carlson Corp.*, 427 So. 2d 266, 268 (Fla. Dist. Ct. App. 1983)).  While Florida courts have been reluctant to find that policies and procedures in an employee handbook or manual rise to the level of enforceable contract rights, the courts have acknowledged it is possible for such employee documents (other than a formal contract) to create enforceable rights if there is "language in the employee manual expressly providing that the manual constitutes a separate employment agreement" or the parties have reached a mutual agreement to this effect.  *Walton v. Health Care Dist. of Palm Beach County,* 862 So.

5

2d 852, 856 (Fla. Dist. Ct. App. 2003) (quoting *Quaker Oats,* 818 So.2d at 578).  In some circumstances, a formal employment contract may incorporate documents such as an employee manual or guide.  *See M.S. v. Nova Se. Univ. Inc.,*(Fla. Dist. Ct. App. 2004).  In other instances, an employment manual or guide may serve as the employment contract itself. *Univ. of Miami v. Frank*, 920 So. 2d 81 (Fla. Dist. Ct. App. 2006) (the parties agreed to and the court construed the Faculty Manual as the contractually governing document in a dispute over the term, "tenured salary" as used in the Manual).  An employer's unilateral policy statements may also rise to an enforceable contract if there is an express reference to a period of employment and the benefits to accrue therefrom.  *Linafelt v. Bev, Inc.*, 662 So. 2d 986, 989 (Fla. Dist. Ct. App. 1995) (citing *McConnell v. E. Air Lines, Inc*, 499 So. 2d 68, 69 (Fla. Dist. Ct. App. 1986); *LaRocca v. Xerox Corp.*, 587 F. Supp. 1002, 1003 (S.D. Fla. 1984)).

C.

Florida's statute of frauds provides that:

> No action shall be brought . . . upon any agreement that is not to be performed within the space of 1 year from the making thereof, . . . unless the agreement or promise upon which such action shall be brought, or some note or memorandum thereof shall be in writing and signed by the party to be charged therewith or by some other person by her or him thereunto lawfully authorized.

Fla. Stat. § 725.01.  The statute is designed "to prevent persons from being enmeshed in and harassed by claimed oral promises made in the course of negotiations not ending in contracts reduced to writing."  *Cohen v. Pullman Co., 243 F.2d 725, 729 (5th Cir. 1957); see Yates v. Ball*, 181 So. 341, 344 (Fla. 1938); *see also Johnson Enters. of Jacksonville, Inc. v. FPL*

*Group, Inc.*, 162 F.3d 1290 (11th Cir. 1998); *Dwight v. Tobin*, 947 F.2d 455 (11th Cir. 1991);

*All Brand Importers, Inc. v. Tampa Crown Distribs.*, 864 F.2d 748, 750 (11th Cir. 1989).

  As a general rule, an oral contract for an indefinite time is not barred by the statute.

*Byam v. Klopcich,* 454 So.2d 720, 721 (Fla. Dist. Ct. App. 1984).  "Only if a contract could

not possibly be performed within one year would it fall within the statute."  *Id*. at 721 (citing

*Yates v. Ball, 181 So. 341 (1937) and Gulf Solar, Inc. v. Westfall*, 447 so. 2d 363 (Fla. Dist.

Ct. App.)).  For an agreement to be unenforceable under the statute of frauds, "it must be

apparent that it was the understanding of the parties that [the agreement] was not to be

performed within a year from the time it was made."  *Yates*, 181 So. at 344.  The party

alleging unenforceability due to the statute of frauds has the burden of establishing this

defense.  *Spanziani v. Bancroft*, 618 So.2d 744, 746 (Fla. Dist. Ct. App. 1993).

  Under Florida law, a written note or memorandum of the agreement or promise upon

which the action is based may satisfy the statute of frauds and a "a note or memorandum may

take almost any possible form. . . . All that the statute requires is written evidence from which

the whole contract may be made out.  Further, '[f]or purposes of the statute of frauds, several

writings, only one of which is signed by the debtor, may be aggregated to satisfy the statute

provided that the signed writing expressly or implicitly refers to the unsigned document.'"

*Kolski ex rel. Kolski v. Kolski*, 731 So.2d 169, 171-72 (Fla. Dist. Ct. App. 1999) (citations

omitted).

III.

A.

Starting with Plaintiff's claims for breach of an express oral contract in Counts I and II, Defendant first argues that such are barred by the statute of frauds.  It maintains that Plaintiff's employment relationship with Ricoh was intended to last and did last for more than one year.  Citing Plaintiff's testimony ("as long as I performed my job, I have a job") and his ten-year tenure with Ricoh, as well as his claims for extra personal compensation on the basis of his calculation of lost revenues and profits on contracts lasting three, four, or five years, and the lack of a written agreement, Defendant seeks dismissal of these claims as a matter of law.[6]  (Doc. 67 at 11).

Secondly, Defendant argues that Plaintiff cannot create an enforceable employment contract in Florida by citation to sporadically issued policies, procedures and communications as set forth in paragraph six of his Complaint because such policy statements are not employment contracts "unless there is an express reference in the statement to a period of employment and the benefits to accrue therefrom."[7]  Defendant urges that its Branch

---

[6]In legal support, Defendant cites *All Brand Importers*, 864 F.2d 748, and *LynkUs Commc'ns, Inc. v. WebMD Corp.*, 965 So. 2d 1161 (Fla. Dist. Ct. App. 2007), and argues that the facts of this case fall squarely within the rule that an oral agreement establishing an ongoing business to continue indefinitely is barred by the statutes of frauds.  *See also Khawly v. Reboul*, 488 So. 2d856  (Fla. Dist. Ct. App.1986); *Tobin & Tobin Ins. Agency v. Zeskind* (Fla. Dist. Ct. App. 1975); *Specialized Transp. of Tampa Bay, Inc. v. Nestle Waters N. Am., Inc.*, No. 8:06-cv-421-T-33EAJ, 2008 WL 4080205 (M.D. Fla. 2008).

[7]*See Linafelt,* 662 So. 2d at 989 (citing *LaRocca*, 587 F. Supp. at 1003); *Muller*, 427 So. 2d at 268-70; *see also Caster v. Hennessey,* 727 F.2d 1075, 1076-77 (11th Cir. 1984); *OneSource Facility Servs., Inc. v. Mosbach*, 508 F. Supp. 2d 1115, 1123 (M.D. Fla. 2007). Thus, an enforceable employment contract requires "the parties must have a definite and

Management Compensation Program contained disclaimers that the program was not a contract and could be modified or terminated at any time.  With respect to Count II, which incorporates the expressly agreed to provisions of the company's Code of Conduct and Code of Ethics, Defendant also argues that Plaintiff cannot rely on alleged breaches of either Code as both disclaim that they are binding contracts.[8]

Thirdly, Defendant claims that its incentive measures were to be based on actual revenues generated and not on the basis of revenues lost (even if because of a breach).  Since there was no meeting of the minds on such an incentive plan as Plaintiff proposes, Defendant contends the contract claims based thereon are unenforceable.

In response, Plaintiff first argues that the facts surrounding the nature and terms of the oral agreement are in dispute and cannot be resolved on these motions.[9]  As for the statute of frauds argument, Plaintiff cites to several cases in support of the proposition that the statute does not apply to bar enforcement where the contract is fully performed by a party.[10]

_____

distinct intention, common to both, and without doubt or difference."  *See In re Paxson Elec. Co.*, 248 B.R. 451 (M.D. Fla. 2000).

[8]In support, Defendant cites *Rumbel v. Suggs*, 908 F. Supp. 901, 904 n.2 (M.D. Fla. 1995); *Freese v. Wuesthoff Health Sys., Inc*., No. 6:06-cv-175-Orl-31JGG, 2006 WL 1382111 (M.D. Fla.2006); *OneSource Facility Servs., Inc.,* 508 F. Supp. at 1123; and *Riel v. Morgan Stanley*, No. 06 CV 524 (TPG), 2007 WL 541955 (S.D. N.Y. 2007).

[9]Plaintiff also asserts that there are outstanding discovery disputes which he suggests deprive him of needed information to fully respond to these motions.  I disagree.  The discovery about which Plaintiff still complains does not affect his ability to address the issues raised by these motions in any significant way.

[10]*See e.g. Grossman v. Levy,* 81 So.2d 752, 753 (Fla. 1955); *Hiatt v. Vaughn*, 430 So.2d 597, 598 (Fla. Dist. Ct. App. 1983) (complete performance by one party of an oral contract not to be performed within one year takes the contract out of the statute of frauds).

Secondly, Plaintiff argues that a suit to recover unpaid wages under an oral employment agreement for an indefinite time is not barred by the statute.[11]  He urges that the employment relationship in this case was for an indefinite period of time but his compensation package was calculated and earned according to a series of annual agreements which were fully completed within the business year.  Thirdly, Plaintiff urges that Florida's statute of frauds does not require that executory contracts such as this be in writing; rather, it requires only some writing sufficient to indicate the terms of the agreement.[12]  Here, Plaintiff contends that Defendant's Code of Conduct and Code of Ethics, correspondence from his boss, annual budgets and evaluations sufficiently embody the terms and conditions of his employment and compensation to satisfy the statute of frauds.

Defendant's contention that Plaintiff's contract claims should be dismissed because he cannot create an enforceable employment contract in Florida by citation to sporadically issued policies, procedures and communications as set forth in paragraph six of his Complaint or by citation to Codes of Conduct or Ethics as set forth in paragraph seven and eight of the Complaint is, in principle, correct.  As set forth above, under Florida law, employment contracts require definiteness and certainty in terms and Florida courts are reluctant to find that policies and procedures in company manuals rise to the level of enforceable contracts. Clearly, the circumstances in the instant case illustrate the wisdom in the rule.  While the agreement to employ Plaintiff and pay him a salary and bonus as the branch manager in

---

[11]*See Elliot v. Carl H. Winslow, Jr., P.A.* (Fla. Dist. Ct. App. 1999).

[12]*See Kolski ex rel. Kolski,* 731 So.2d at 171-73.

10

Tampa is sufficiently certain to permit enforcement, his complaint alleges a hodgepodge of additional terms drawn from a variety of sources over a period of time and is hardly the model of certainty.  As noted above, state law provides that a company's "unilateral policy statements cannot, without more, give rise to an enforceable contract.  In Florida, policy statements are not employment contracts unless there is an express reference in the statement to a period of employment and the benefits that accrue from them."  *Linafelt,* 662 So.2d at 989.  Nonetheless, Plaintiff swears that each such term was expressly agreed to be a part of his employment contract.  Under Florida law, there is the possibility that provisions in employee handbooks or policies and procedures manuals may rise to the level of enforceable contract rights if there is language therein providing that such constitute a separate employment agreement *or the parties have reached a mutual agreement to that effect.  See Walton,* 862 So.2d at 856 (emphasis added).  Here, Plaintiff can point to no such language from the assorted policy statements, account plans or Codes he relies upon for the terms of his contract.  In fact, where there is written evidence of the policy or procedure that Plaintiff claims as part of his contract, the stated policy or procedure invariably disclaims that it is a contact or it otherwise evidences that the policy is discretionary and subject to change by Defendant.[13]  However, despite these disclaimers, Plaintiff provides sworn testimony that the

---

[13]For example, the company's Branch Manager Compensation Program, which set forth guidelines for administering the company incentive bonus program for employees such as Plaintiff, contained a disclaimer that "[n]o oral or written statements made by company employees or contained in any Company material are intended to create promises of continued employment or contractual obligations. . . ."  *See* (Doc. 67, Ex. 6).  Similarly, the Code of Conduct (Docs. 42, Att. A, 110-3 at 21-52) states that its guidelines are subject to modification from time-to-time at the discretion of Ricoh.  (Doc. 110-3 at 50).  The Code of Ethics (Docs. 42, Att. B, 110-3 at 53-67) states that it is "not an employment contract,

cited "terms and conditions" in paragraph six of his Complaint were expressly agreed to be a part of his employment contract as were the Code provisions he relies upon in paragraphs seven and eight of the Complaint.  While this is adamantly denied by the Defendant, given the fundamental factual dispute which exists and the fact that the court must consider the evidence in a light most favorable to Plaintiff, it is not grounds to grant Defendant's motion solely because the agreement appears indefinite.  *See Falls v. Lawnwood Med. Ctr.*, 427 So.2d 361 (Fla. Dist. Ct. App. 1983).

As for the statute of frauds issue, while the terms of the alleged oral contract are disputed by the parties, there is sufficient clarity and certainty concerning Plaintiff's employment relationship with Defendant to permit a resolution of the statute of frauds issue. To this end, Plaintiff was hired by Defendant as an "at will" employee under an oral agreement with the Savin corporation to be the branch general manager of the Tampa branch. In entering this agreement, Plaintiff agreed to abandon his own business to become the manager.  Plaintiff's employment and "principal areas of compensation," including salary plus annual bonus opportunities together with certain fringe benefits, were confirmed by Defendant in writing.  *See* (Doc. 110-2 at 1-2).  Neither party disputes that Plaintiff's employment was for an indefinite period of time.  Indeed, Plaintiff's testimony that "as long as I performed my job, I have a job, period," is urged by both parties and appears entirely

---

although adherence to its principles is a condition of employment" and "each employee of the Company is, and will be held, responsible for the observance of [the Code]."  (Doc. 110-3 at 53).  The parties agree employees were expected to abide by these Codes in the conduct of their business affairs but dispute whether the terms of the Codes were a part of Plaintiff's employment contract.

accurate.  *See* Pl.'s Dep. (Doc. 108 at 18).  At all times pertinent to Plaintiff's claims for

breach of contract, he received an annual salary plus bonuses under Defendant's Branch

Management Compensation Program, a program to provide eligible participants such as

Plaintiff the opportunity to earn incentive income based on their performance against

established goals.  Memoranda setting out the components of the incentive program were sent

to the employee twice annually.  *See* (Docs. 80-2, 110-5 at 17-31).[14]  While Plaintiff asserts

that the terms of his oral contract have existed since he was hired in 1997, it is apparent that

the full terms of his oral contract must have derived from several sources and over a period of

years.  Plaintiff's claims for damages in this suit are premised on his contention that from

2003 forward, he was deprived of revenue credits that he would have received but for

Defendant's breach of the various promises, policies and procedures, and Code provisions

that he claims are a part of his actual contract.  Plaintiff cites to ten specific instances where

he contends Defendant caused him to lose such revenue credit.  Some of these "lost" revenues

derive from contracts extended to others for terms from three to five years, and by Plaintiff's

calculations, if his branch were credited with the revenues lost, he is entitled to additional

compensation extending over the full term of those contracts (even after his separation from

the company) under the compensation program in effect at the time of the alleged breach.

---

[14]The memoranda indicated that payments under the plan were at the discretion of the vice president, among others, and subject to change to reflect changed business circumstances.  *See e.g.* (Doc. 80-2 at 3).  For Defendant's explanation of how branch managers were compensated under the Branch Management Compensation Program, *see* Dorsey Decl. (Doc. 67, Ex. 6).  By Dorsey's account incentive compensation was determined based on total actual revenues and pre-tax profit and did not include lost revenues or hypothetical revenues or profits on any transaction.  *Id.*

To resolve the statute of frauds issue, Defendant urges the court to employ the analytical approach taken in *All Brand Importers*.  There, the court noted that whether an oral agreement is outside the statute of frauds and thus enforceable depends on the intent of the parties at the time they made the agreement.  *All Brand Importers*, 864 So .2d at 750.  The court noted further that, "under Florida law the intent of the parties with regard to the time of *performance* (not the possibility of contingent termination) is the key factor in determining whether an oral agreement is enforceable."  *Id.*  In light of the specific facts in that case, the court found that the parties intended for their business relationship to last for more than one year and thus the agreement was unenforceable under the statute of frauds.  *Id.*  Similarly, the court in *LynkUs Commc'ns* looked to the object to be accomplished by the agreement and the surrounding circumstances and concluded that the business arrangement in dispute had been intended to extend beyond one year and was thus unenforceable under the rule that "'[a]n oral agreement to enter into a new business which will continue indefinitely has been held to be within the purview of'the statute of frauds."  *LynkUS Commc'ns,* 965 So.2d at 1165 (citations omitted).[15]

In contrast, Plaintiff urges the court to adopt the approach taken in several Florida cases wherein the courts have found that a simple employment agreement for an indefinite

---

[15]In factual support of this argument that the contract was for an on-going business relationship, Defendant cites first to Plaintiff's allegations in his original verified complaint (Doc. 1) that the oral agreement between the parties was to form a new joint business venture. Plaintiff dropped those allegations in his subsequent complaints and they are no longer a part of the operative Complaint (Doc. 42), which addresses the contract as an oral agreement for employment.  Defendant also cites to Plaintiff's ten-year tenure with Ricoh, as well as his claims for "extra personal compensation" on the basis of his calculation of lost revenues and profits, past and future, on contracts lasting three, four, or five years.

14

period is not barred by the statute.  For example, in *Elliot*, the court stated "[t]he general rule is that an oral contract for an indefinite time is not barred by the Statute of Frauds.  Only if a contract could not possibly be performed within one year would it fall within the statute." *Elliot*, 737 So. 2d at 610.  Here, Plaintiff contends that, since there is no showing the contract could not be performed within one year, it is outside the statute.  In any event, Plaintiff argues that his complete performance of an oral contract not to be performed within one year takes his contract out of the statute.  *See Hiatt,* 430 So.2d at 597.[16]

The Florida Supreme Court has recognized that "the statute of frauds applies only to contracts which by their terms are not to be performed within a year, and does not apply because they may not be performed within that time." *Yates*, 181 So. at 344 (citing *McPherson v. Cox*, 96 U.S. 404 (1877)).  In other words, to make a parol contract void, it must be apparent that it was the understanding of the parties that it was not to be performed within a year from the time it was made.  *See id.*  Thus, when "no definite time was fixed by the parties for the performance of their agreement, and there is nothing in its terms to show that it could not be performed within a year according to the intent and understanding of the parties, it should not be construed as being within the statute of frauds." *Id.*  However, when "if from the object to be accomplished by [the agreement] and the surrounding circumstances, it clearly appears that the parties intended that it should extend for a longer period than a year,

---

[16]This latter argument appears without merit as Plaintiff's performance under this indefinite employment contract would be properly characterized as partial performance only and "partial performance of a contract for personal services is not an exception to the provisions of the statute of frauds." *Johnson v. Edwards*, 569 So.2d 928, 929 (Fla. Dist. Ct. App. 1990) (citing *Tobin*, supra; *Rowland v. Ewell*, 174 So.2d 78 (Fla. Dist. Ct. App.(1965))).

15

it is within the statute of frauds, though it cannot be said that there is any impossibility preventing its performance within a year." *Id.*

In a light most favorable to the Plaintiff, the terms of his agreement are as set forth at paragraphs six, seven, and eight of his Complaint. Rather than describing a simple employment contract for an indefinite term, he alleges a complex set of terms allegedly agreed to in 1997 and again on one or more occasions in 2003, 2004, 2005 and 2006. Clearly, the terms of the contract as described by Plaintiff were derived from a variety of sources and formed over a period of years, and Plaintiff's performance of this agreement could not have been completed within a year of its making. At the outset of the agreement in 1997, Plaintiff sold his own business to Defendant on the promise that he would become the branch manager of Defendant's Tampa branch. He was credited with eight years of service for benefit purposes and promised a salary, annual bonuses and fringe benefits. In light of these circumstance alone, it appears most improbable that Plaintiff (or Defendant) intended that his performance under the agreement would be completed within one year. Even accepting that it could be, the court looks at other circumstances of the alleged agreement suggesting that the relationship was intended as a long-term one, the performance of which could not be accomplished within a year. That this was intended to be a long-term relationship is borne out by Plaintiff's testimony that the terms of his agreement derived from a variety of sources and the fact that some of these terms could not have existed at the time of the contract was originally entered. Thus, certain of the "promises" allegedly supporting Plaintiff's claim for damages by way of lost bonuses clearly would have been made, if at all, well after the inception of the contract. To the extent that Plaintiff claims that provisions from the Code of

16

Conduct or the Code of Ethics are a part of his oral agreement, this too suggests the long-term expectations of his performance.  The Codes of Conduct attached to his Complaint bear dates of December 20, 2001, and February 2002, and as Plaintiff's allegations suggest, the Code of Ethics was not promulgated until June 2005.  Furthermore, as Plaintiff fashions his claim for damages, it is based on the alleged multi-year loss of revenue credits to his branch because of Defendant's conduct in 2003 through 2006, which resulted in multi-year contracts going to others and a resultant loss of business to his branch.  By Plaintiff's accounting, he is owed damages for the lost revenue over several years even after he separated from the company.  Clearly, in Plaintiff's contemplation, his performance was never intended to be complete within one year and it was not.  In short, even in a light most favorable to Plaintiff, his performance was not intended to be complete within a year of the making of this contract and I conclude that the agreement is within the statute of frauds.

Even if the statute of frauds is applicable to this agreement, Plaintiff maintains that there are adequate writings revealing the terms of his compensation agreement and Defendant's breaches to satisfy the statute and permit his enforcement of the same.  As noted above, a written note or memorandum of the agreement or promise upon which the action is based may satisfy the statute of frauds and the memorandum may take almost any possible form.  Here, Plaintiff argues that the Codes published by the Defendant, correspondence from his superior, and annual budgets and evaluations sufficiently embody the terms and conditions of his employment regarding compensation and bonuses to satisfy the statute of frauds.

The proffered evidence supports that Plaintiff's employment and compensation including salary plus annual bonus opportunities were confirmed by Defendant in writing at

17

the outset of the relationship.  At all times pertinent to Plaintiff's claims for breach of contract, he received an annual salary plus bonuses under Defendant's Branch Management Compensation Program.  Twice annually, Plaintiff received a memorandum setting out the components of the incentive plan from his manager and/or vice president.  In a light favorable to the Plaintiff, these memorandum confirm the mutual understanding of the parties concerning Plaintiff's bonus opportunities during a given fiscal year.  To the extent that the Plaintiff can also cite to specific *written* terms in company policies and procedures or the Codes which, by his testimony, were expressly agreed to by the parties and breached by the Defendant, enforcement of the compensation agreement is not barred by the statute of frauds.  However, I conclude that to the extent that these writings confirm the mutual agreement of the parties on the matter of incentive compensation, they doom Plaintiff's claims that he is owed additional monies under the compensation program on a breach of contract theory.

Two reasons support this conclusion.  First, to the extent that the parties agreed to the terms of the compensation plans, they necessarily agreed that such incentive payments were wholly discretionary with Plaintiff's managers.  Similarly, to the extent that Plaintiff relies on the Code of Conduct or the Code of Ethics as a part of his employment contract, he then must also accept the agreements there were also subject to change at the sole discretion of the company.  Second, to the extent that the company promised additional compensation, the agreement was that such compensation be measured by a number of factors, the most significant to this suit being the actual revenues and pre-tax profits generated by Plaintiff's branch.  Plaintiff proffers no promise evidenced by a writing that required that he be paid in the manner he urges under his contract claims, i.e., that he would receive credit (and

ultimately bonus money) for revenues generated by another when he did not win a contract or lost the business.[17]   There is no dispute that Defendant made no promises under the compensation program or any other policy or procedure backed up by a writing to pay incentives on the basis claimed, and insofar as Plaintiff seeks relief for breach of an express contract, the claims fail.  Defendant's motion for summary judgment should be GRANTED as to Counts I and II.

B.

In Count III, Plaintiff alleges that Defendant impliedly agreed, and by its conduct, tacitly promised him that he would receive compensation based on the implied terms of his employment as set forth in paragraphs six and seven of the complaint.  Under Florida law, "a contract implied in fact is one form of an enforceable contract; it is based on a tacit promise,

---

[17]In six of the ten instances where Plaintiff alleges Defendant breached his employment contract, he seeks credit for revenues and thus, additional incentive payments, for business that went to a competitive bidder, ostensibly because Defendant assisted the competitor.  Plaintiff identifies the six "lost" customers as Hillsborough County Government, Pinellas County School Board, Sun Coast Credit, Well Care, Hillsborough County College, and Hillsborough Community (sic) Clerk of Court.  Beyond the shear speculation inherent in each of these claims that he would have won the contract without Defendant's conduct, the compensation plan Plaintiff allegedly agreed to and which he can prove up at trial set forth no agreement to pay incentives in these circumstances.  Similarly, Defendant never promised Plaintiff any bonus where a current contract was lost to the company because of poor service and the revenues from the contract ceased, as alleged to be the case with the Jabil Circuit contract.  In the remaining three instances of alleged breach, he claims: (1) Defendant improperly took his account with Health Trust Purchasing Group and transferred it (and the revenues) to an independent dealer in Tennessee; (2) Defendant improperly took his account with USF and transferred it (and the revenues) to Lanier; and (3) Defendant denied him 10% of all equipment sales to Stewart Title outside the Tampa area based on his having secured a contract with them in 1999 and 2003.  *See* (Doc. 42, ¶¶ 13-55).  Even assuming that Defendant breached some aspect of the oral contract in each of these instances, the award of an incentive bonus was discretionary with Ricoh and subject to termination, modification and/or change at any time without Plaintiff's agreement.

one that is inferred in whole or in part from the parties' conduct, not solely from their words." *Commerce P'ship 8098 Ltd. P'ship v. Equity Contracting Co.,* 695 So.2d 383, 385 (Fla. Dist. Ct. App. 1997). Such a contract may arise where a person performs services at another's request, under circumstances "fairly raising the presumption that the parties understood and intended that compensation was to be paid. In these circumstances, the law implies the promise to pay a reasonable amount for the services." *Id.* (citations omitted.)

Defendant argues for the dismissal of Count III on the basis that the court has previously determined that the implied contract based on the Codes and other policies discussed above is not enforceable under Florida law. Citing the court's Order addressing the motion to dismiss count three in Plaintiff's second amended complaint, Defendant simply argues the count is gone.[18]

In response, Plaintiff does not clearly set forth other tacit promises or implicit agreements to support this claim for additional bonus monies under the compensation plan. At best, he assures the court that they exist. *See* (Docs. 72 at 9-10; 88 at 8) ("Plaintiff asserts and record affidavits offered in opposition to summary judgment corroborate that explicit and implicit agreements in and beyond the Code of Ethics and Code of Conduct, are binding.").

---

[18]In the Order, the court stated, "[t]o the extent that count three relies on an 'implied agreement' to abide by the terms of the Code of Conduct (or Code of Ethics), count three is subject to dismissal for the reason stated in the August 31, 2007, order." *See* (Doc. 37 at 4). In that earlier Order, the court quoted Florida law in stating, "policy statements contained in employment manuals do not give rise to enforceable contract rights in Florida unless they contain specific language which expresses the parties' explicit mutual agreement that the manual constitutes a separate employment agreement." (Doc. 25). Finding no such language in the Codes, the court granted the motion to dismiss.

In the face of Defendant's challenge, this response is wholly inadequate to demonstrate the viability of this claim. By my review, in light of Florida law and the court's earlier ruling, it is clear that Plaintiff has no claim on an implied-in-fact contract theory insofar as it is based on an implied agreement or tacit promise by Ricoh to abide by its Codes or assorted policies or procedures, including the Branch Manager Incentive Program, all of which expressly stated or otherwise suggested that they were not contracts.

In any event, even assuming that the court's prior Order did not wholly dispose of this count, there is absolutely no proffered evidence supporting Plaintiff's theory of an implied promise to pay him additional incentive bonuses as claimed. The clear implication from the parties' course of dealing and performance in this case is that there was no such promise. Furthermore, to the extent that Florida law allows a recovery on such theory, the measure of damages is the reasonable amount for the services rendered. Here, Plaintiff does not point out the services he rendered for which he was not reasonably compensated. Defendant's motion for summary judgment should be GRANTED as to Count III.

C.

With regard to Count IV and Plaintiff's claim for unjust enrichment, Defendant maintains that Plaintiff had the same job responsibilities for ten years and consistently earned between $145,000 and $185,000 in salary and bonuses during the last four years at issue. Citing *In re Paxson Elec.*; *Ankerstjerne v. Schlumberger, Ltd.*, No. 04-2379, 2005 WL 2106625 (3d Cir. 2005); and *Allen v. Ford Motor Co.*, 188 F.3d 506 (6th Cir.1999), Defendant argues that Plaintiff is not entitled to equitable relief where he cannot show that he provided Ricoh with anything more than the work he was hired for and paid to do.

21

In response, Plaintiff does not address the substance of Defendant's motion. Instead, he asserts that, as an alternative to his breach of express and implied contract claims and even in the absence of such contract, he may recover additional sums for his work performed on behalf of Ricoh.[19] Plaintiff notes that such claim is unaffected by the statute of frauds, and he cites to *Harrison v. Pritchett,* 682 So. 2d 650, 651-52 (Fla. Dist. Ct. App. 1996), in support thereof. Plaintiff also urges that he may plead such inconsistent claims under Florida law and is not compelled to elect between them prior to the time for entry of judgment. *See* (Doc. 88 at 9-10).

I find that this count should also be dismissed as a matter of law. The elements of a cause of action for unjust enrichment in Florida are: (1) the plaintiff has conferred a benefit on the defendant; (2) the defendant has knowledge of the benefit; (3) the defendant has accepted or retained the benefit conferred; and (4) the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying fair value for it. *Commerce P'ship 8098 Ltd. P'ship,* 695 So.2d at 386. Recovery under this theory may be appropriate where there is no enforceable express or implied in fact contract but where the defendant has received something of value or has otherwise benefitted from the service provided. *Id.* at 377. However, courts have held that such equitable relief is not available where the plaintiff has provided a defendant with no more than that which he was hired to do and for which he was paid his salary. *See In re Paxson Elec. Co.,* 248 B.R. at 463 n. 12*; Gene B. Glick Co. v.*

---

[19]Plaintiff cites to *Commerce P'ship 8098 Ltd. P'ship,* 695 So. 2d 383.

*Sunshine Ready Concrete Co.,* 651 So. 2d 190 (Fla. Dist. Ct. App. 1995)*; Ankerstjerne*, 2005 WL 2106625, *3.

By my consideration, Plaintiff has no alternative claim for unjust enrichment in the circumstances of this case. Even fully crediting his theory as sound, Plaintiff cannot demonstrate a benefit he provided to Defendant for which he was not fairly compensated by way of salary and bonuses. As discussed above, he seeks damages (additional incentive compensation) not on the basis that he provided a work benefit for which he was not paid, but because he believes he lost revenue credits when the Defendant dealt with him in violation of the oral terms of his contract. As a consequence of lower revenues, he received lower bonuses and he seeks additional compensation to make up for the lost revenues. However, "[u]njust enrichment is equitable in nature and cannot exist where payment has been made for the benefit confirmed." *Gene B. Glick Co.,* 651 so.2d at 190. Given that Plaintiff was paid fully by way of salary and bonuses for the work he performed and the revenues he generated and the company has received no additional benefit of his labors in relation to these lost revenues, Count IV should be DISMISSED.

## D.

Lastly, regarding Plaintiff's claim for national origin discrimination at Count IV, Plaintiff alleges that his boss, Fred Berger, made anti-Arabic comments to him in 2003, and from 2003 forward, Ricoh acted to deprive him financially with the intended effect to cause him to leave. According to Plaintiff, Berger directed that his evaluation be lowered to his financial detriment in 2004, and he was denied the opportunity to interview for the new post-merger manager position in Tampa in 2007, a position filled by a non-Arab white man.

Plaintiff generally alleges that he tried to apply for job openings in other parts of the country as well.  When he applied, he was told the positions were no longer open.  By his allegations, he was not hired because of his national origin.  (Doc. 43).  In February 2007, Plaintiff complained to the EEOC alleging discrimination in relation to his not being interviewed or hired for the new position in Tampa.  Follow-up documents expanded the complaint and included general allegations of denial of job opportunities and promotions and denial of compensation and bonuses based on his Arab descent.  *See Id.* at Att. C-F.

By its motion, Defendant argues that Plaintiff cannot establish a *prima facie* case of national origin discrimination in connection with any position of employment he actually pursued, and even if he can, he cannot establish that the legitimate business reasons given by Ricoh for its hiring decisions were a pretext for discrimination.

Title VII prohibits employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.  42 U.S.C. § 2000e-2(a).  In a Title VII discrimination case, a plaintiff may establish a *prima facie* case of discrimination through direct or circumstantial evidence.  *See Bush v. Barnett Bank of Pinellas County*, 916 F. Supp. 1244, 1251-52 (M.D. Fla. 1996).  Direct evidence of discrimination consists of "evidence which, if believed, would prove the existence of discrimination without inference or *presumption."*  Holifield v. Reno, *115 F.3d 1555, 1561 (11th Cir. 1997) (quoting* Carter v. *City of Miami*, 870 F.2d 578, 581-82 (11th Cir. 1989)).  To establish a *prima facie* case of race or national origin discrimination through circumstantial evidence, Plaintiff must show: (1) he is a member of a group protected by Title VII; (2) he was qualified for the position; (3) he

24

suffered an adverse effect on his employment; and (4) his employer treated him less favorably than similarly situated employees of different races.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Gupta v. Walt Disney World Co.*, No. 07-11409, 2007 WL 4165934 (11th Cir. 2007).  Plaintiff needs only to establish facts adequate to permit an inference of discrimination.  *Holifield*, 115 F.3d at 1562.

Upon this showing, the burden of production then shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action.  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-07 (1993).  Upon such showing, the burden of production then shifts back to the Plaintiff to show that Defendant's proffered reason for the discharge was merely a pretext for discrimination.  *Burdine*, 450 U.S. at 256.  The plaintiff may prove intentional discrimination by showing that the employer's proffered reason is unworthy of credence.  The trier of fact may consider evidence establishing the plaintiff's *prima facie* case and inferences drawn therefrom on the issue of whether the defendant's explanation is pretextual.  *Reeves*, 530 U.S. at 143 (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 511; *Burdine*, 450 U.S. at 255, n.10).  "[A] plaintiff is entitled to survive summary judgment, and judgment as a matter of law, if there is sufficient evidence to demonstrate the existence of a genuine issue of fact as to the truth of each of the employer's proffered reasons for its challenged actions."  *Latham v. Dep't of Children & Youth Servs.*, 172 F.3d 786, 793 (11th Cir. 1999) (quoting *Combs*, 106 F.3d at 1529).

On this claim, the undisputed facts reveal that in about April 2007, Defendant merged with a subsidiary, Lanier.  The merger brought a reorganization to Defendant's operations.  Under the reorganization, Plaintiff's Branch General Manager position in Tampa

25

was replaced by a Marketplace General Manager position. Plaintiff was advised that he would have to apply for the position. Plaintiff expressed an interest in that position and on two occasions was scheduled for an interview. As it developed, Craig Current, a Lanier employee, was named the new Marketplace General Manager in Tampa without Plaintiff being afforded an opportunity to interview for the position. It is undisputed that Plaintiff pursued another opportunity as Vice-President of Sales in the Pacific North region but was not interviewed for that position either, ostensibly because a decision was made not to fill the position. Although there were other job opportunities in the reorganized company, Plaintiff testified that he chose not to pursue them either because he believed they would involve a demotion or because he thought doing so would be futile - Ricoh's refusal to interview him for the two positions he applied for clearly suggested that it was not going to hire him for any such position. Plaintiff did not retain a position with Ricoh after the merger.

That Plaintiff's ethnicity had anything to do with the hiring decisions is entirely disputed. In Plaintiff's view, he did not get either of the new positions because he is an Arab-American. Plaintiff maintains that this was nothing new - he had let it be known to the company for several years that he wanted to advance in the company but he was never considered for any other job opportunities. He urges that all the positions were filled by non-Arabs and, by the time of the merger, he was the only manager not hired into the merged company. Plaintiff believes that Berger, his vice president at Ricoh, is the person who discriminated against him. In support of Berger's discriminatory animus, Plaintiff cites anti-Arab comments made by Berger in 2003 through 2005 and the fact that Berger was disrespectful to him and unfair in his treatment of him. Plaintiff complains that his reviews

26

were conducted unfairly and he blames Berger for his being denied opportunities to advance in the company in San Francisco, Los Angeles, Detroit, and New York. *See* Pl.'s Dep. (Doc. 108 at 103-110, 117-25).[20] Anti-Arab comments by Berger are confirmed by Richard Ferraro, a former Ricoh manager in Seattle. *See* Ferraro Aff. (Doc. 75, Ex. 7). Berger denies making the anti-Arab comments and asserts that the hiring and promotion decisions he made over the years were based on legitimate business considerations. *See* Berger Decl. (Doc. 67, Ex. 7).

In support of its position, Defendant proffers testimony and documentary evidence to support that it made repeated efforts to engage Plaintiff in the interview process during the lead-up to the merger. *See* McIntyre Decl. (Doc. 67, Ex. 4); Floyd Decl. (Doc. 67, Ex. 5); *see also* (Doc. 110-2 at 47-49, 110-3 at 1- 6). Defendant proffers that Current was hired for the Tampa position because of his experience as a regional vice-president with Lanier, and to accommodate him for a health condition he was suffering at the time. It notes that the decision-maker was not Berger, but Barry Ward, who denies any discriminatory animus. *See* Ward Decl. (Doc. 67, Ex. 3).[21] Berger testified that he was informed of the decision and indicated he was okay with it, nothing more. (Doc. 67, Ex. 7). Defendant proffers that three

---

[20]Plaintiff's deposition testimony suggests that his allegation that Berger gave him a low evaluation in 2004 may be incorrect. *See* Pl.'s Dep. (Doc. 108 at 112-17). In any event, it appears that Plaintiff cites this in support of his claim that the company, via Berger, set upon a course to cause him to not succeed and not as a separate basis for relief. If it is intended as the latter, it appears time- barred. The allegations about not being considered for job opportunities in San Francisco, Los Angeles, and Detroit, even if true, are admittedly time-barred, but Plaintiff urges they are relevant for the court's consideration as showing a pattern of discriminatory conduct.

[21]Defendant also cites to EEOC accommodation guidelines and notes that Current's reassignment to this position was consistent with those guidelines. (Doc. 67 at 20-21).

others in addition to Plaintiff had their interviews cancelled once the decision was made to give the position to Current.  *See* Floyd Decl. (Doc. 67, Ex. 5).  As for the Pacific North position, Ricoh acknowledges that in March 2007, Floyd advised Plaintiff of an opening there for Vice President of Sales (as well as for Marketplace General Manager).  (Doc. 67, Exs. 4, 7).  When notified, Plaintiff promptly responded and expressed his interest in the Vice-President position.  *Id*. at Ex. 5.  Six days later, Floyd advised Plaintiff that the decision had been made not to create that position but that the Marketplace General Manager position was still available.  *Id.* at Ex. 6.  According to Floyd, the Vice President of Sales position was never created in the Pacific North, and although he advised Plaintiff that the position there for Marketplace General Manager was still available, Plaintiff never expressed interest.  *Id.*

Defendant's proffered evidence is substantially unrefuted by the Plaintiff.  In rebuttal to Ricoh's explanation of its hiring decisions, Plaintiff proffers the same facts and circumstances, his subjective belief that he was denied opportunities because he was of Arab descent, and the fact that he alone among the area managers not hired into the merged company.  Noticeably missing is any demonstration that the decision-maker who chose Current for the Tampa position selected a less qualified person or bore any animus toward him or that other non-Arabs seeking an interview were not treated the same way as he was.  Plaintiff also fails to proffer evidence to refute that the Vice President of Sales position in the Pacific North was never filled or demonstrate that whoever made that decision bore an ethnic animus to his interest in the position

Upon my consideration, Plaintiff may claim adverse employment actions only in connection with two matters, Defendant's decision to hire another for the position of

Marketplace General Manager in Tampa, and its decision not to interview him for the position of Vice President of Sales in the Pacific North.  As noted above, his complaints about job opportunities he was denied in San Francisco, Los Angeles and Detroit are time-barred.  As for the job opportunities in the merged company, the undisputed facts establish that Plaintiff only sought two positions, the one in Tampa and the Vice-President position in the Pacific North.

Addressing the hiring decision for the position in Tampa first, even in a light favorable to the Plaintiff, it is difficult to conclude that he can establish a *prima facie* case of national origin discrimination.  He undeniably is of Arab descent.  The evidence of his work history and performance record indicates he was qualified for the new position of Marketplace General Manager.  On the other hand, the evidence suggests that Current, the person who got the job, was more qualified or at least as equally qualified as Plaintiff.  Plaintiff does not contradict Defendant's proffer that Current had 30 years experience with Lanier and had served in a vice president role in that company.  Nor does he contradict that Current was first picked to fill a regional vice-president role for the merged company but given the lesser position in Tampa as an accommodation when he developed a health issue.  But, it is apparent that Current is a white male and not of Arab descent.  Accepting Plaintiff's side of the story, his vice-president, Berger, on several occasions over a period of time evidenced a general prejudice against Arabs, if not Plaintiff directly and at times, he treated Plaintiff rudely.  However, there is no evidence that Ward, the decision-maker on the Tampa hiring, bore any such ethnic or racial animus toward Arabs and there is no evidence that Berger influenced the

hiring decision in Tampa.  In addition to the Plaintiff, three other persons also had their interviews cancelled upon Current's selection for the position.

Upon my consideration, even assuming that such is enough to establish a *prima facie* case, Plaintiff totally fails to demonstrate even a question of fact that the stated reasons for Ricoh's hiring decision for this position and the denial of an interview are false and a pretext for discrimination.  His reliance on the same facts supporting his *prima facie case* is simply insufficient to create a triable issue of fact.  Defendant is entitled to summary judgment on this aspect of Plaintiff's claim.

As for the position in the Pacific North, there is less proffered evidence from which to draw conclusions.  It is clear that Plaintiff was notified by a letter from Floyd of two open positions in Portland, Oregon, and Plaintiff promptly responded that he was interested in one of them, the Vice President of Sales position, and he suggested dates for a telephone interview.  In a follow-up letter sent six days later, Plaintiff was advised by Floyd that he was mistaken and that management had decided not to fill the position.  At the same time, Floyd did advise that the Marketplace General Manager position in the Pacific North remained open and he invited Plaintiff to interview for the same the following week.  Plaintiff did not pursue that interview.  He claims futility as his reason for not doing so.  Who made the decision not to fill the position and why that decision was made is left uncertain on the record before the court

Defendant urges that Plaintiff cannot demonstrate a *prima facie* showing in this instance either as the position was never filled and, accordingly, Plaintiff was not treated any differently than anyone else in connection with this decision.  Even assuming Plaintiff was

qualified for the position, I find that he does not demonstrate that he was treated any differently than any other person who expressed interest in the position or that the denial of even an interview was in any way related to his Arabic descent.  Furthermore, even if Plaintiff could establish a *prime facie* case of discrimination, he proffers nothing but his suspicions that the proffered reason for not interviewing him was a pretext for discrimination.  For instance, there is no showing that the person who decided the position would not be created or filled, whoever that was, had any prejudice toward Arabs or that Plaintiff's national origin somehow played any role in the decision not to interview him.  Further, insofar as the record demonstrates, the decision not to fill the position appears to have affected equally anyone interested in the job.  Defendant proffers that this decision was not unique and that there were other areas in the country where the same decision was made not to fill such positions and this too is unrefuted by the Plaintiff.

It is axiomatic that an employer may make a decision for good reasons, bad reasons or no reason at all as long as it is not for discriminatory reasons.  *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir. 1984).  Here, even if Plaintiff were credited with a *prima facie* showing, he cannot establish even a fact issue that this decision was for discriminatory reasons.  Again, Plaintiff's rebuttal, such as it is, is insufficient.  While Plaintiff testified he was the only one unemployed after the merger, that fact adds little given the choice he made to only pursue two openings.  His bald claim of futility does not suffice to create a fact issue either as he demonstrates nothing to contradict the evidence that when he was informed that the vice-president position would not be filled, he was expressly encouraged to seek an interview for the Marketplace General Manager position in the same locale and yet, he chose not to pursue it.  Further, there is also unrefuted evidence that

Plaintiff made a similar choice not to pursue a similar position in New York. In the given circumstances, I find nothing in Plaintiff's rebuttal to raise an actual question of fact as to the falsity of the company's explanation on this decision. Defendant is entitled to summary judgment on this claim as well.

IV.

For the foregoing reasons, it is recommended that **Defendant's Motion for Summary Judgment** (Doc. 67) be **GRANTED**. On this recommendation, the Defendant's **Motion for Judgment on the Pleadings as to Counts I, II and III** (Doc. 66) may be **DENIED** as moot.

Respectfully submitted on this
17th day of October 2008.

THOMAS B. McCOUN III
UNITED STATES MAGISTRATE JUDGE

## NOTICE TO PARTIES

Failure to file written objections to the proposed findings and recommendations contained in this report within ten days from the date of its service shall bar an aggrieved party from attacking the factual findings on appeal and a *de novo* determination by a district judge. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; M.D. Fla. R. 6.02; *see also* Fed. R. Civ. P. 6; M.D. Fla. R. 4.20.

Copies to:
The Honorable Steven D. Merryday, United States District Judge
Counsel of Record